Frederic H. BOYCE, Plaintiff,

v.

ALEXIS I. duPONT SCHOOL DISTRICT et al., Defendants.

Civ. A. No. 4141.

United States District Court, D. Delaware.

April 27, 1972.

As Amended April 28, 1972.

L. Coleman Dorsey, and Sheldon N. Sandler, Wilmington, Del., for plaintiff.

William E. Wiggin, Wilmington, Del., for defendants.

## OPINION

STEEL, District Judge:

Plaintiff was employed by the defendant, Alexis I. duPont School District, to teach the World of Work program in the Alexis I. duPont High School during the school year 1970–71. He was not reemployed in 1971–72. On June 4, 1971, he brought suit against the district, its board of education, the board members and the superintendent of the district.

Plaintiff alleges that in failing to reemploy him defendants violated his civil rights vouchsafed by the First Amendment (free speech) and the Fourteenth Amendment (substantive due process) and also breached a contract which defendants made to reemploy him.

In support of the civil rights charge, the complaint alleges that on March 17, 1971, the school board advised him of its intention to terminate his services at the end of the school year and stated as a reason for the termination "the elimination of the course [World of Work] which you have been teaching." Plaintiff further alleges that the World of Work program was not being eliminated and that the reason assigned was not the real reason for his non-reemployment. The real reason, according to plaintiff, was to retaliate against plaintiff for having spoken critically of the World of Work program outside of the school. This act of reprisal, plaintiff claims, was in violation of his free speech rights under the First Amendment. Finally, plaintiff alleges that the stated reason for not renewing his contract was wholly without basis in fact, was arbitrary and unreasoned, and in derogation of his Fourteenth Amendment right to sustantive due process.

The complaint, as amended on February 24, 1972, prays that defendants be ordered to tender him a contract for 1971–72,[1] compensate him for damages, compensatory and exemplary, for failure to reemploy him, and accord him a hearing comporting with due process on the question of his employment. Plaintiff filed a motion for summary judgment limited to obtaining an order granting him an administrative hearing before the school board. This was denied by opinion dated March 23, 1972, 341 F.Supp. 672.

All of the remaining issues were tried without a jury on April 10 and 11, 1972.

On April 18 and 19, 1972, the parties filed their proposed findings of fact and conclusions of law. On April 21, 1972, a 378 page transcript of testimony was filed. An immediate decision was requested since, if plaintiff is not to be employed by defendants for the 1972–73 school year he must make application by May 1st for another position which is open to him elsewhere.

Jurisdiction exists under 28 U.S.C. § 1343(3), (4), 42 U.S.C. § 1983 and under pendent jurisdiction.

The year 1970–71 was the first year plaintiff was employed to teach in the Alexis I. duPont School District. He was then without tenure. 14 Del.C. § 1403.[2] Nonetheless, section 1410 required that if defendants did not intend to reemploy him the following year he be so advised by May 1st with their reasons.

On March 17, 1971, the board of education wrote plaintiff a letter stating its intention to terminate his services at the end of the school year, and said (Px 5):

> "The reason for your termination is the elimination of the course which you have been teaching."

Thereafter plaintiff requested a hearing before the school board which was denied.

Plaintiff's employment relationship with the defendant district began on July 14, 1970. On that date, an informal employment agreement for the school year 1970–71 was entered into by them evidenced by a handshake with Dr. Howie, the superintendent. This informal agreement was ratified by the board of education and was later confirmed by letter dated July 20, 1970 from Dr. Howie to plaintiff. (Px 6).

◼ In late July or early August, plaintiff attended a workshop conference for the World of Work program. Dur-

---

1. Since this is now impossible, plaintiff seeks reemployment for 1972–73.

2. Under sections 1411, 1412, 1413 and 1414 teachers with tenure are entitled to be given reasons for termination, notice of termination, hearings before the school board and State judicial review.

ing the conference, plaintiff asked about the future of the program and in particular what would happen to him if it was not refunded by the Federal Government.[3] Collison, the director of curriculum of the district, replied that this would present no problem for in that event plaintiff would be placed somewhere else in the district for the next and the ensuing years. Collison was without authority to make this commitment since the board of education of the district alone had the authority to make contracts for teacher employment. In addition, the promise was without consideration, post-dating as it did plaintiff's earlier employment agreement. Plaintiff is not entitled to relief based upon breach of contract.

Early in 1971, at the request of the Delaware Council for Exceptional Children, plaintiff wrote a letter to it about the World of Work course. Plaintiff described the course and its purpose in a general way and specified the number of teachers who were giving it. Plaintiff spoke of the great need for the program in the district and said (Px 3):

"[B]ut it is severely limited because of its unusual nature to many of the older teachers and because of a need for more personnel. It is hoped that this will be remedied in the future."

He then said:

"[T]he difficulty of the parents in our district to recognize that there is a need for special education in an area that aims its entire educational program toward the college bound child . . . . The student who needs the extra 'push' is not taken into account. Nor is the fact that many of the college prep students are, indeed, disturbed to some degree."

Without plaintiff's knowledge the Council published the letter in its own newsletter.[4]

In February 1971, shortly after plaintiff wrote the Council, he discussed the World of Work program with Rathfon, a fellow student at the University of Delaware. When Rathfon asked plaintiff about the course, plaintiff said that it was not being given in depth and that there was no community work involved.[5]

Sometime before the first of March, Mrs. Benthal, the principal of the high school, prepared a staff evaluation report which stated (Dx 2):

"Mr. Boyce works with the socially-emotionally disturbed. He is extremely interested in his work.

Mr. Boyce will go out of his way to be helpful. He has the ability to communicate the fact with students that he really cares about them. As one student said 'you can just tell him your problems, and he understands.'

Mr. Boyce is always neat, well groomed and polite. He is generally tactful in dealing with others." [6]

---

3. The World of Work program was financed from three sources.

The Federal monies went to pay Stanard's salary, purchase equipment, pay mileage for teachers to take trips, and to pay travel expenses for pupils and teachers. The State monies went to pay teachers' salaries. Local monies were used to pay a supplement of salary and for certain equipment (R 206–207).

4. These comments in the letter are mild and restrained. They lack the vehemence which would normally prompt a school board to decide not to employ a teacher. Apart from what is later said in this opinion on the subject it is doubtful whether this could have had such effect.

5. What is said in the above footnote about the letter which plaintiff wrote is equally applicable to this conversation.

6. In February of 1971 Stanard filed with Collison a highly critical and derogatory report concerning the competence of plaintiff as a teacher and the experience which the school was having with him. This report covered the entire period from August 1970 to February 1971 on virtually a week to week basis. It concluded by recommending that he not be assigned 'that position' in the coming year. This was not offered in evidence before the trial concluded on April 11th but was admitted in chambers on plaintiff's application as a supplement to the record on April 14th. None of the defendants were

The following sentence read:

"Not recommended for employment." [7]

Following the evaluation and some-time before March 17, 1971, Mrs. Benthal had been told by the foster mother of a foreign exchange student that there had been talks between the plaintiff and the student about the latter accompanying the plaintiff to Florida to attend a con-ference, and that in this connection the student had understood (Mrs. Benthal was told) that the school would finance his trip. Since any such financing was contrary to school policy, Mrs. Benthal held a conference with plaintiff and Collison to discuss this foreign exchange student problem. As she was leaving her office to go to the conference, a copy of the newsletter of the Council for Exceptional Children was handed to her. This set forth the letter which plaintiff had written to the Council. At the conference, Mrs. Benthal was agi-tated and decidedly unhappy about plain-tiff having discussed the course with an outside party and she said as much. This was the first time that Mrs. Ben-thal had seen plaintiff's letter.

Neither Dr. Walker, the president of the board of education of the district, nor Dr. Howie, the superintendent of the district, had heard of the letter prior to the time when the present suit was be-gun. While other members of the board of education were not called to testify it was stipulated that if they had been called they would testify that they were unaware of the letter until after the pres-ent action was begun. (234).

■ Prior to the time when Mrs. Benthal evaluated plaintiff and recom-mended that he not be reemployed, (sometime before March 1, 1971) Stan-ard, the Vocational Education Coordina-tor employed by the Federal Govern-ment, told Collison about the letter which plaintiff had written to the Council. There is no evidence that either Stanard

or Collison passed this information along to Mrs. Benthal, Dr. Howie, or any member of the board of education before Mrs. Benthal recommended plain-tiff's non-reemployment. It was not the motivation behind Mrs. Benthal's rec-ommendation.

In late February, and prior to Mrs. Benthal's recommendation not to reem-ploy plaintiff, Collison learned that plaintiff had expressed views critical of the World of Work program to Rathfon. Collison spoke to plaintiff about this and told him that if he had any criticism it should be discussed within and not out-side the district. This proof is insuffi-cient to establish that the defendants' failure to reemploy plaintiff was based upon plaintiff's talk with Rathfon. Plaintiff had the burden of proving that the defendants' action was to censure him for his talk with Rathfon. Plaintiff has not met that burden. The record contains no evidence that any member of the board of education of the district, Dr. Howie or Mrs. Benthal even knew anything about the Rathfon incident when Mrs. Benthal recommended that plaintiff not be reemployed.

The failure of defendants to reemploy plaintiff was not in retaliation for plain-tiff having exercised his First Amend-ment right to speak or write freely about the World of Work course.

Plaintiff contends that when he was not reemployed he was denied substan-tive due proceess. This is based on the theory that the elimination of the World of Work program was not the true rea-son for defendants' decision not to re-employ him, and that the defendants' ac-tion was arbitrary and capricious.

■ Plaintiff had no tenure, pos-sessed no contract for reemployment, and was without civil service status. Nevertheless, under Delaware law, if the school board intended to dispense with his services for 1971–72, he was entitled

confronted with the document or examin-ed about it, and plaintiff admits that there is nothing in the record to substantiate that any of the defendants were aware of

Stanard's comments. (See Px 8, 374–376).

7. This appeared on the original report but was not on the copy given to plaintiff.

to written notice by May 1, 1971, containing a statement of the board's reasons for its decision. 14 Del.C. § 1410. By implication, unless a teacher receives a notice conformable to the statute, his employment must be continued the following year. The statute means that when reasons are assigned by the board, they must be the true reasons. If the real reasons for an intended termination are not given, compliance with section 1410 is lacking and the board must accord employment to the teacher for the ensuing year.

As the 1970 fall term progressed, questions arose among the school authorities as to whether the World of Work course was meeting the needs of the students as they had been identified at the high school level. A feeling existed among the school authorities that the course was much more suitable to junior high school students. (168, 265). It was felt that the program was too fluid and that a more structured program was needed. (290–291). In November, under the recommendation of the State Department for Vocational Education, it was determined that instead of the high school program in World of Work a distributive education or Diversified Occupations program should be investigated (168, 265, 290–1, 294).

It is undisputed that no World of Work course was given at the high school level in 1971–72, and that Diversified Occupations was substituted for it. Plaintiff contends that this was but an extension or supplementation of the World of Work course, that he was qualified to teach it, and that in refusing him this opportunity the action of the board was arbitrary and capricious.

More specifically, plaintiff asserts that on March 17, 1971, despite what they told him, the school authorities had made no final determination that the World of Work program would not be taught in the high school in 1971–72. The record contains substantial evidence at variance with plaintiff's contention. Mrs. Benthal testified that in late 1970 or early 1971 after discussing the World of Work program with Standard and Collison, a decision was reached by them not to recommend a continuation of the program. She said that in late January or early February she discussed these views with Dr. Howie. (265).

Dr. Walker testified that prior to March 17th a decision had been made to discontinue the World of Work program and fixed the time of the decision generally within a week or two of February 15th. (239–240).

Dr. Howie said that he judged that it was early in March 1971 when Collison told him that the World of Work program was being discontinued in favor of the Diversified Occupations program. (257–258).

Collison testified that as early as November or December there was a meeting attended by representatives from other school districts as well as the State Department in which the subject of vocational education was considered, and the possibility of discontinuing the World of Work program and substituting a Diversified Occupations program was discussed. (170–171). He first said that a decision was made in January to drop World of Work in favor of Diversified Occupations. (171). Later he said that a definitive decision was not made until a few days before the letter of March 17, 1971 was written to the plaintiff. (227).

Stanard said that in December the decision was made that a drastic change would have to be made in the World of Work program at the high school level and state supervisors were asked what direction the district should pursue. He said the final decision to phase out the program and not hold it at all was made, he believed, in January 1971. He added that Collison and Mrs. Benthal were aware of the decision and participated in it. (332).

While the testimony of these witnesses is not entirely consistent and varies as to the precise time when the decision to phase out the World of Work program was reached, the net of the testimony is

that the decision was arrived at at least before March 17, 1971 and probably before Mrs. Benthal made her recommendation not to reemploy plaintiff.

Plaintiff argues that no definitive decision to drop the World of Work program could possibly have been reached before March 17, 1971. His argument is based largely upon documentary evidence (more specifically Px 2), and testimony given with respect to it. Px 2 is an application filed by several school districts, including the defendant, with the Delaware Department of Public Instruction (Vocational Education Division) for the approval of a program designated "World of Work Dissemination Project-Explorations of Occupations". It was filed January 28, 1971. It applied to the World of Work program in 1971–72 (196) to be given both in the high school (where plaintiff taught) and the middle school. The application indicated that two teachers would be required for the program at the high school (197, 224–225). The application was approved on June 17, 1971. This was more than three months after the school board had advised plaintiff that the World of Work course was being eliminated.

Funds were made available for one high school teacher to teach the World of Work program in 1971–72 (198, 328), but the funds received as a result of the Px 2 application were spent at the middle school. (220–221). Despite the fact that on March 17, 1971 the school board told plaintiff that the World of Work course was being eliminated in 1971–72 in the high school, the school authorities made no attempt to modify the application to reflect the fact that the World of Work program was being phased out. (200).

Standing alone, Px 2 and the testimony referred to above tends strongly to support plaintiff's contention that no definitive decision was reached before March 17, 1971 to drop the World of

Work program for the high school in 1971–72.

Another document, however, bears importantly upon the question of the bona fides of the defendant in telling plaintiff he was not being reemployed because his program was being eliminated in 1971–72. This was a proposal which was filed on February 4, 1971 by the Alexis I. duPont High School with the Delaware Department of Public Instruction (Occupational/Vocational Education) with reference to a program designated "Cooperative Occupational Educational Program-Diversified Occupations". The application described this as "a new program". The aims and objectives were described as follows (Px 7, p. 2):

"Our aims and objectives are founded in the need to provide a program of vocational education where *none presently exists*, and allow the students with alternative career goals through a program of Diversified Occupations." (Emphasis added.)

Collison was asked to reconcile his testimony that the decision was made prior to the letter of March 17th to forego giving the World of Work program in the high school in 1971–72 with the fact that an application (Px 2) was filed in January 1971 and never withdrawn or amended which sought approval to give the course. He said (227):

"When these proposals were written you actually have no assurance of getting either. We did not want to close the door to being able to have a program in high school."

He insisted, however, that a definitive decision was reached not to give the program at or about the time when the March 17th letter was written. (227).

Collison testified that the Diversified Occupations program was not approved by the state board until late in the spring and the final decision to give that course was not reached until the State had approved the program.[8]

---

8. Apparently the authority to give the Diversified Occupations program was found in House Bill 509 which appears as Chapter 348 in Volume 57 of Laws of

Stanard attempted to reconcile defendants' claim that before March 17, 1971 the school board had definitely decided to eliminate the World of Work program in the high school in 1971–72 with the Px 2 application. He said that a proposal submitted to the State or Federal Government is "a conjecture" (324), meaning, it seems, that its approval is always uncertain. Directing his testimony to the reason for filing both the World of Work application and also the Diversified Occupations (509) application, he said (332):

"My recommendation was that we apply for the funds for 509 and the World of Work. Now, if the 509 funds come through, then we drop the World of Work application, and reverse that the other way around."

When the totality of the testimony is weighed, the true factual situation appears to be this: Prior to March 17, 1971, the defendants had definitely decided, despite Mrs. Benthal's judgment as to plaintiff's competence and general abilities, that it would be desirable from an academic standpoint not to continue to teach World of Work at the high school level in 1971–72, but to replace it with the Diversified Occupations course. This decision was subject to the condition, however, that the latter program would be approved by the State Department of Public Instruction. In order that defendants might keep their option open to teach World of Work if they failed to secure State approval of the Diversified Occupations program, the World of Work application (Px 2) was filed. The priority which defendants accorded to Diversified Occupations as against World of Work, both before and after March 17, 1971, is clear and definite. In this sense, defendants had definitely resolved before March 17th to eliminate the World of Work program subject to approval of Diversified Occuations by the State. Strictly and techni-

cally speaking, no final irrevocable decision, however, had been made. In these circumstances, it cannot be said that by any constitutional yardstick the reason which the school board gave plaintiff for not reemploying him was unsupported by the evidence or was arbitrary or capricious. As it turned out, the World of Work course which the board told plaintiff would not be in the high school curriculum in 1971–72 was in fact not included in it. If it had been, plaintiff would have been employed to teach the course. (211).

Plaintiff contends that the World of Work and Diversified Occupations courses were similar in content, that he was qualified to teach the latter, and that he should have been employed to give it.

The World of Work program which plaintiff had been teaching differed in a number of respects from the Diversified Occupations program which was substituted for it.

The World of Work program was established as an introductory type of situation, whereby students would be taken on various trips to occupations that they might show some interest in. It was an investigative type of program. When they were there they would discuss the qualifications for the occupation. They would discuss the training necessary to become involved in this occupation. They would take photographs, and tape record interviews with various employees. And then they would come back to the school and write what they had seen and heard and their impressions of this particular type of work situation. The World of Work program did not require a student to work on-the-job. (230).

The pupils for the World of Work program were selected on the basis of certain criteria, i. e., those who had not succeeded in the regular school program either because they were not ed-

Delaware approved on March 25, 1970, although the record is far from clear. For this reason, the Diversified Occupa-

tions program is sometimes referred to as the "509 Program". House Bill 509 is Dx 1.

ucable, mentally retarded, or socially or emotionally maladjusted. On the other hand, any student who was interested in the Diversified Occupations program was free to engage in it. (213–214). While the World of Work program was aimed at interesting some of the students to which the efforts of the Diversified Occupations program were directed, the latter program included some students which would not have been included in the World of Work program. (200).

The Diversified Occupations program is a more "structured" program than the World of Work. It is one which requires students to meet a certain number of periods per week with an instructor. (319). The World of Work program is based upon a fluid concept, a drop-in program, where students would meet the plaintiff on their own free time. (319).[9]

The program of World of Work involves no set curriculum to which a student in it is related. There is no fixed amount of class time which he is required to spend on the program. He can continue in it on a once a week, twice a week, or possibly three times a week basis throughout the school year or he can terminate his participation at any particular time. This was not true of the Diversified Occupations program which required attendance at regularly scheduled classes. (345–346).

Plaintiff was certified as an M.C.M. teacher which means a teacher of the socially and emotionally maladjusted. (301). Before teaching at Alexis I. duPont in 1970–71, plaintiff had worked for the Newark School District as a teacher of elementary emotionally disturbed children from January of 1969 to June of 1970. For the first half of the year 1971–72, he worked with mentally retarded and disturbed children in the West Chester Public School, and during the second half of the year he worked in the same school with emotionally disturbed children at a junior high school level. Before he came to Newark, he had worked in Colorado at a home for mentally retarded children as a teacher and also for two years at a home for pre-delinquent boys where he was a counsellor and tutor. (5–7).

The record which deals with plaintiff's qualifications to teach Diversified Occupations is replete with inconsistencies, hearsay and testimony as to facts which probably could be best substantiated by documents, and is generally unsatisfactory. It is in a high state of confusion to say the least. See for example, Boyce, 66, 360–2; Dr. Howie, 257–60; Collison 201–2, 228, 230–1; Stanard, 296–301; Rathfon, 102–4; (Ct. Exhibit #1). If plaintiff's qualifications to teach is relevant, plaintiff has failed to carry the burden of establishing that he was so qualified. Furthermore, the decision of the board not to reemploy plaintiff rested well within its discretionary prerogative.

The Court accepts the principle that even though a teacher is without tenure it is a violation of the Civil Rights Act for a school to refuse to reemploy him (a) arbitrarily and capriciously for a reason not supported by substantial evidence in derogation of his Fourteenth Amendment due process rights, or (b) because he has exercised First Amendment rights of free speech. See cases cited at page 6 of the summary judgment opinion dated March 23, 1972.

The action of defendants in not reemploying plaintiff was not in violation of the Civil Rights Act.

The complaint will be dismissed.

9. Boyce said that he made agreements with students for them to spend certain of their free periods with him and that a schedule was prominently posted on the bulletin board in his room. He said this is what is known as structured time.